IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF:<br><br>AN APPLE iPHONE SEIZED BY THE ALLEGHENY COUNTY POLICE IN CONNECTION WITH THE ARREST OF MELQUAN HUDSON ON JANUARY 13, 2022<br><br><br>LOCATED AT THE ALLEGHENY COUNTY POLICE DEPARTMENT HEADQUARTERS | Magistrate No. 22-115 |

**APPLICATION AND AFFIDAVIT FOR SEARCH WARRANT**

I, Shannon Hasek, a Detective with the Allegheny County Police, being duly sworn, depose and state that:

**INTRODUCTION AND AGENT BACKGROUND**

1.      This Affidavit is made in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for the issuance of a search warrant authorizing the search of a cellular telephone currently in law enforcement custody as described below and in Section I of Attachment A, and the extraction from that property of the electronically stored information described in Section II of Attachment A.

2.      I have been employed as a Detective with the Allegheny County Police for more than seven years.  As part of my duties, I am authorized to conduct investigations of persons who engage drug trafficking and unlawful firearms possession, and I have been personally involved in numerous investigations involving drug trafficking and firearms.  As such I am familiar with the way in which individuals involved in illegal drug trafficking unlawful firearms possession use cellular telephones and the evidence that can be obtained from cellular telephones of individuals involved in that illegal activity.

3.     The information contained herein is based upon my own personal investigation, observations, and knowledge as well as upon the investigation, personal observations, and knowledge of other law enforcement officers with whom I have discussed this case.  Because this Affidavit is being submitted for the limited purpose of establishing probable cause in support of a search warrant, I have not included every item of evidence or piece of information known to me; rather, I have included only those facts necessary to establish probable cause.

## IDENTIFICATION OF THE DEVICES TO BE EXAMINED

4.     This Application and Affidavit are being submitted in support of a search warrant for the following electronic device, which is currently in the custody of the Allegheny County Police Department located at 875 Greentree Road, Ten Parkway Center, Suite 100, Pittsburgh, PA 15220:

> An Apple iPhone that is black in color. This item was collected in connection with the arrest of Melquan Hudson on January 13, 2022 (hereinafter **TELEPHONE 1**).

5.     Investigators, including your Affiant, believe the records and other information contained within **TELEPHONE 1** contain evidence of violations of Title 21, United States Code, Sections 841(a)(1) and 846, which make it unlawful for individuals to possess with intent to distribute and distribute controlled substances or conspire to do the same, and Title 18, United States Code, Section 924(c)(1)(A)(i), which prohibits the possession of firearms in furtherance of drug trafficking crime (hereinafter the **TARGET OFFENSES**).

6.     The applied-for warrants would authorize the forensic search of **TELEPHONE 1** for the purpose of identifying electronically stored data particularly described in Section II of Attachment A.

## FACTS RELATING TO PROBABLE CAUSE

7.      On January 13, 2022, your affiant and other officers arrested Melquan Hudson after executing a search warrant that was signed by the Honorable Kelly Bigley, Court of Common Pleas.  The search warrant authorized the search of a residence and the person of Melquan Hudson.

8.      The evidence that led to the request for the search warrant was during the month of January 2022, I (Det. Hasek) conducted a narcotics investigation during which time a confidential informant (hereinafter CI) was developed that could purchase crack cocaine from an alleged narcotics trafficker identified as Melquan Hudson (DOB: 06/15/2002).  According to the CI, Melquan Hudson resides at 824 Gray Street located in the McKees Rocks Borough section of Allegheny County.  The CI informed detectives that Melquan Hudson conducts a crack cocaine related business from this residence, which includes Hudson meeting the CI at 824 Gray Street to sell the CI crack cocaine. The CI stated Hudson utilizes cellular telephone number (412) 892-1824 to conduct his illicit narcotics business.

9.      The CI stated Hudson will sell various quantities of crack cocaine from 824 Gray Street daily and frequently conducts business throughout the day and night.  The CI has observed Hudson on numerous occasions in possession of crack cocaine that he was selling.  According to the CI, Hudson often keeps quantities of crack cocaine in his residence and on his person daily that is available for sale.

10.     Two controlled buys were conducted during this investigation during the weeks of January 2, 2022 and January 9, 2022, I (Det. Hasek) utilized the CI to make controlled purchases of crack cocaine from Melquan Hudson out his residence at 824 Gray Street.  On each occasion the CI was directed to 824 Gray Street in McKees Rocks where the CI purchased a quantity of crack cocaine directly from Melquan Hudson in exchange for official prerecorded investigative funds. The CI stated that Hudson informed the CI that they had additional quantities of crack

cocaine that he was offering for sale.

11.     It should be noted that Hudson was observed by Detectives involved in this investigation on each controlled buy exiting his residence at 824 Gray Street and meeting the CI near his residence.  Constant surveillance was maintained on Hudson until he met with the CI and the transaction was completed.  Hudson and the CI were never out of sight of surveillance.

12.     As noted above, your affiant applied for a search warrant for Melquan Hudson's residence based on this evidence, and a state search warrant was obtained on January 12, 2020. The search warrant was executed on January 13, 2022.  During the execution of the state search warrant, law enforcement officers located a three firearms, U.S. Currency and suspected narcotics, in quantities and under circumstances that suggest that Hudson was involved in selling the illegal narcotics, as opposed using the substance himself.

13.     More specifically, a search of Hudson's bedroom closet revealed a DPMS Model A-15, 5.56 caliber semi-automatic rifle with a magazine containing 26 rounds of ammunition, a Glock 26 .380  handgun with an extended magazine containing 22 rounds of ammunition, one of which was a chambered round and a Glock 42 9 millimeter handgun containing 3 rounds of ammunition.  Also recovered in Hudson's bedroom were one plastic bag containing suspected crack cocaine (near the defendant's bed) and two plastic bags containing suspected cocaine (in the bedroom closet). A field test was performed on these suspected narcotics and the field test confirmed that the quantity of suspected drugs found in Hudson's bedroom closet tested positive for cocaine, and that the quantity of drugs found near the defendant's bed was crack cocaine

14.     Further, during the search, law enforcement located $5,938.00 in cash (the majority of which was found in Melquan Hudson's bedroom, but $1,861 was found in Hudson's right front pants pocket).  Again, in my experience, individuals involved in drug trafficking often possess

large amounts of cash.  I reviewed the serial numbers of the cash found in Thomas' bedroom with the serial numbers of the cash provided to the confidential informant prior to make purchases of narcotics from the defendant.   Two $20.00 bills with serial numbers MG15846050F and JE26678995F and two $10.00 bills with serial numbers NF51587237A and PA24010757A were provided to the confidential informant as pre-recorded official funds to purchase crack cocaine from Hudson.  These four bills were recovered during the search of Hudson's bedroom at his residence.

15.     Hudson was located in the residence along with his mother, Yolanda Johnson, two juvenile children and Johnson's associate, Floyd Allen.  I have never witnessed any other members located in the residence with Melquan Hudson during either of the controlled buys. Melquan Hudson spontaneously uttered that the bedroom where the crack cocaine, and the cocaine were found was his bedroom.  The defendant also spontaneously uttered that the clothes in the bedroom closet where the cocaine and the guns were found were his clothes, and that it was his bedroom closet.

16.     Hudson's criminal record includes juvenile charges for Possession of a Firearm by a Minor, Firearms Not to be Carried Without a License and Possession with Intent to Deliver.

17.     **TELEPHONE 1** was located on and recovered from Hudson's bedside table connected to a charger in his bedroom.  Also located on the same bedside table were two bracelets from Shuman Center bearing the name and photograph of Melquan Hudson.

18.     The CI informed Detectives during the course of the investigation of Melquan Hudson that they contact Hudson at 412-892-1824 to arrange to purchase crack cocaine.  I called 412-892-1824, blocking my phone number utilizing *67, during the execution of the search warrant and the black iPhone rang immediately showing a blocked number.

19.     Melquan Hudson was taken into custody during the course of this search, and was charged, on January 13, 2022, by federal complaint in the Western District of Pennsylvania with violating Title 21 United States Code, Sections 841(a)(1) and 841(b)(1)(C) (Possession with intent to deliver a quantity of a mixture and substance containing a detectable amount of cocaine, and a quantity of crack cocaine).

20.     Your Affiant is aware through both training as well as experience gained through multiple narcotics investigations, the targets of those narcotics investigations utilize cellular telephones to not only arrange meetings with their drug customers but also speak with fellow co-conspirators as well as their drug sources of supply.  Your Affiant is also aware that these targets also utilize multiple cellular telephones at one time in an effort to not only thwart detection by law enforcement but also to compartmentalize their drug trafficking customers to one phone, their co-conspirators to another phone, and their drug source of supply to yet another phone.

21.     Based upon my training and experience, I am aware that it is generally a common practice for drug traffickers to store the names and phone numbers of drug customers and photographs and video detailing illegal activities in cellular telephones.  Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, and/or will be "fronted" controlled substances from their suppliers, such record-keeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily ascertain current balances.  Often drug traffickers keep "pay and owe" records to show balances due for drugs sold in the past ("pay") and for payments expected ("owe") as to the trafficker's supplier(s) and the trafficker's dealer(s).  Additionally, drug traffickers must maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficking business.

22.     Members of Drug Trafficking Organizations (DTO) often take group photographs with other enterprise members posing with firearms, paraphernalia, money and/or drugs.  Many cellular telephones, including **TELEPHONE 1**, have a camera feature that is readily capable of capturing and storing these group photos.  In my experience, the phones of individuals who illegally possess firearms often contain evidence of unlawful firearm possession in the form of text messages, e-mails, and social media posts.  It has also been my experience that such phones often contain information regarding how an unlawful possessor acquired his firearm.

23.     Members of DTOs often store each other's phone numbers and contact information in the directories of their cellular phones.

24.     Based on my experience and familiarity with cellular telephones, I am aware that the telephones have voicemail and telephone directory features, as well as camera features which allow the user to take photographs and store them in the cellular phone's memory card.  Based on my experience and training, statements by other law enforcement officers, and personal observations, I know that because of the storage capacity of cellular telephones, the portability of cellular telephones, the ease with which information stored on a cellular telephone may be accessed and/or organized, and the need for frequent communication in arranging narcotics transactions, cellular telephones are frequently used by individuals involved in drug trafficking.  In particular, I and other law enforcement officers have found that information frequently maintained on cellular telephones includes the contact numbers of other co-conspirators, contact numbers for narcotics customers and stored photographs of DTO activities.  This evidence will come in the form of caller identification information, call log information, telephone numbers, address information, or other identification information, as well as opened and unopened voicemail and/or text messages, photographs, videos and information about access to the Internet.

25.     Members of DTOs routinely use multiple physical phones in succession as one breaks or the DTO feels that the number associated with the phone is compromised to Law Enforcement.  The physical phone may no longer be an active communicative device, however many times, these old phones are not discarded as they possess value to the DTO.  The replaced device contains within it the contact information for drug customers of the DTO, and many times these phones are maintained as digital phone books should the new active phone become unusable or unavailable.  Furthermore, these replaced phones are commonly kept in a relatively accessible location where either all or select members of the DTO can access the information within should it become necessary.  As stated above, members of DTOs routinely take photographs and or memorialize other information of evidentiary value within these replaced phones.  As such, it is common to recover a multitude of otherwise inactive phones especially at locations central to or important to the DTO. Additionally, your affiant knows that persons who are legally prohibited from the purchase and possession of firearms acquire firearms through unlawful means.  In order to do so the solicitation and transaction thereof is often conducted via digital media devices and the conversations, pictures and specifics of the transaction are often stored within cellular devices.

**ELECTRONIC STORAGE AND FORENSIC ANALYSIS**

26.     As described above and in Attachment A, Section II, this Application seeks permission to search **TELEPHONE 1** for records that might be found on **TELEPHONE 1** which will provide evidence of violations of the **TARGET OFFENSES**.

27.     One form in which the records might be found is data stored on a cellular telephone.

28.     Based on my knowledge, training, and experience, I know that files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can

be stored for years at little or no cost.

29.     Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on an electronic device, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

30.     Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, an electronic device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

31.     Wholly apart from user-generated files, electronic device storage media—in particular, electronic devices' internal hard drives—contain electronic evidence of how an electronic device has been used, what it has been used for, where it was located, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Electronic device users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

32.     Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

33.     Based on my training and experience, I use the following technical terms to convey the following meanings:

        a.     *Wireless telephone*:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication

through radio signals.   These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.   A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.   In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.   These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.   Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

34.     *Nature of examination*.   Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant.   The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

35.     *Manner of execution*.   Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.   Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## **CONCLUSION**

36.     Based upon the foregoing, you Affiant submits that there is probable cause to believe **TELEPHONE 1** contains information related to the **TARGET OFFENSES**, which there is probable cause to believe have been violated by Hudson.


*/s/ Shannon Hasek*
Shannon Hasek, Detective
Allegheny County Police


Sworn and subscribed before me, by telephone
pursuant to Fed. R. Crim. P. 4.1(b)(2)(A),
this 20th day of January, 2022.


_____
CYNTHIA REED EDDY
CHIEF UNITED STATES MAGISTRATE JUDGE

11

## ATTACHMENT A

**I.    Device to be Searched**

1.    **TELEPHONE 1.**

a.    An Apple iPhone that is black in color. This item was collected in connection with the arrest of Melquan Hudson on January 13, 2022, and will be hereby referred to as **TELEPHONE 1**.  This device is currently in the custody of the Allegheny County Police Department located at 875 Greentree Road, Ten Parkway Center, Suite 100, Pittsburgh, PA 15220.

**II.    Records and Other Information to Be Seized**

1.    All records, information, and items evidencing who used the device and/or when and/or from where, as well as evidence of violations of 21 U.S.C. §§ 841(a)(1), 846 and 18 U.S.C. § 924(c)(1)(A)(i), on **TELEPHONE 1**, including:

a.    incoming and outgoing call and text message logs,

b.    contact lists,

c.    photo and video galleries,

d.    sent and received text messages,

e.    online searches and sites viewed via the internet,

f.    online or electronic communications sent and received, including email, chat, and instant messages,

g.    sent and received audio files,

h.    navigation, mapping, and GPS files,

i.    telephone settings, including speed dial numbers and the telephone number for **TELEPHONE 1**and related identifying information such as the ESN for **TELEPHONE 1**,

j.    call forwarding information,

k.    messages drafted but not sent, and

l.    voice messages.

2.    As used above, the terms "records" and "information" include all of the foregoing

items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.  However, no real-time communications will be intercepted and searched during execution of the search warrant.

3.     In searching **TELEPHONE 1**, investigating officers and agents may examine all of the data contained in **TELEPHONE 1** to view its precise contents and determine whether **TELEPHONE 1** and/or its data falls within the items to be seized as set forth above.  In addition, they may search for and attempt to recover "deleted," "hidden" or encrypted data to determine whether the data falls within the list of items to be seized as set forth above.